IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAIME PACHECO-FIGUEROA,<br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STATES OF AMERICA,<br>　　　　　　　　　　Defendant. | CIVIL ACTION<br>NO. 22-4113 |

Scott, J.                                                                                                September 29, 2023

## MEMORANDUM

Plaintiff Jaime Pacheco-Figueroa avers that he injured his arm while he was incarcerated at the Federal Detention Center (FDC) in Philadelphia, did not receive a necessary surgery for six months, and now has permanent injuries due to that delay that could have been avoided through prompt medical attention. He filed a personal injury lawsuit against the United States (the Government) under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80. The Government has moved to dismiss Mr. Pacheco-Figueroa's claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The Government asserts that the court does not have subject matter jurisdiction over this case, because the FTCA claims are barred by the independent contractor exception and the discretionary function exception. The court finds that neither the exception bars Mr. Pacheco-Figueroa's FTCA claims and will deny the Government's motion to dismiss.

**I.      BACKGROUND**

The FDC is operated by the Federal Bureau of Prisons (the BOP), and Mr. Pacheco-Figueroa was incarcerated at the FDC during the main events mentioned in his complaint. *See*

1

Compl., ECF 1.[1] In a Rule 12(b)(1) motion, the moving party may present evidence beyond the pleadings to support its argument that the court lacks subject matter jurisdiction. *See* Part II, *infra*. Here, the Government provides additional details about the FDC's contract with an independent contractor, NaphCare, Inc. (NaphCare), and asserts that NaphCare is responsible for the delays in scheduling Mr. Pacheco-Figueroa's treatment with medical providers outside of the FDC. *See* Mot. to Dismiss 2-9, ECF No. 14. To support these claims, the Government provides a declaration from the FDC's Assistant Health Services Administrator, Melanie Stegeman, medical records filed under seal, and portions of the contract between NaphCare and FDC. *See* Mot. to Dismiss, Ex. A (hereinafter Stegeman Decl.), Ex. A-1 (hereinafter Medical Records (followed by Bates stamp number where appropriate)), and Ex. B (hereinafter Contract Excerpts). Mr. Pacheco-Figueroa was unaware of NaphCare's involvement in his medical care when he filed his complaint; however, he reviewed the documents attached to the Government's Motion to Dismiss and provided additional facts and argument based on those documents. *See* Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss 3 n.2, 3-7 (hereinafter Response or Resp.). To understand the parties' disputes, it is first necessary to understand how the FDC and NaphCare work together to provide medical care to people who are incarcerated at the FDC.

A.      **The FDC's and NaphCare's Roles in Medical Treatment**

The Government asserts that, at all times relevant to Mr. Pacheco-Figueroa's complaint, the FDC had a contract with NaphCare to serve as the FDC's "comprehensive medical services provider for all medical care that could not be provided by the medical staff at the [FDC]." Mot. to Dismiss 2; Stegeman Decl., ¶ 4. The contract states that NaphCare is an independent

---

[1]      According to the Government, Mr. Pacheco-Figueroa was transferred to the Federal Correctional Institution in Florence, Colorado on or about August 22, 2021. *See* Mot. to Dismiss 4 n.4, ECF No. 14. At the Initial Pretrial Conference held on September 12, 2023, Mr. Pacheco-Figueroa's counsel noted that he had been transferred to a federal prison in California.

contractor, and that "[t]he Government may evaluate the quality of professional and administrative services provided, but retains no control over professional aspects of the services rendered, including, by example, the contractor's professional medical judgment, diagnosis, or specific medical treatments." Mot. to Dismiss 8 (quoting Contract Excerpts BOP00240). Moreover, the contract specifies that NaphCare is "solely liable for and expressly agrees to indemnify the Government with respect to any liability producing acts or omissions by it or its employees or agents." *Id.* (quoting Contract Excerpts BOP00240).

Ms. Stegeman avers that incarcerated people at FDC are initially examined by the FDC's medical staff. Stegeman Decl. ¶ 7. If the FDC's medical staff believes that specialty care is required, the FDC's medical staff electronically submits a consultation request. *Id.* at ¶ 8. If that consultation request requires a follow-up appointment with an outside provider, that request must be approved by the FDC's Clinical Director, who chairs the FDC's Utilization Review Committee (URC). *Id.* at ¶ 9. If the Clinical Director approves the request, an FDC Health Services Technician forwards the consultation request to NaphCare. *Id.* at ¶ 10. At that point, NaphCare becomes responsible for scheduling and notifying FDC medical staff of the appointment. *Id.* at ¶ 11. For security reasons, incarcerated people are not informed of when they will attend outside appointments. *Id.* at ¶ 13.

Mr. Pacheco-Figueroa has not yet been able to review the entire contract. *See* Resp. 4 n.3. However, he correctly notes the following: The contract states that "[a]ll FDC referrals shall be the sole responsibility and decision of the Government. No inmate may be transferred to another medical facility, with exception of emergency cases, without advanced approval by authorized FDC medical staff." *See id.* (quoting Contract Excerpts BOP00232). Similarly, the contract provides that the FDC "reserves the right to determine the manner of an inmate's referral, i.e.,

3

via on-site clinic, via community-based referral, via telemedicine consult, or any other method the FDC determines to be reasonable and appropriate." *See id.* at 5; Contract Excerpts BOP00228. There are also considerable restrictions on what an independent contractor may or may not do when treating incarcerated people, including not guaranteeing future treatment or discussing future appointment dates. *See* Resp. 5 (quoting Contract Excerpts BOP00232). Importantly, "[t]he BOP . . . is under no obligation to follow consultant recommendations," and a contractor cannot "perform any treatment/procedures unrelated to the reason for consultation without receiving prior authorization from the FDC." *See id.* (quoting Contract Excerpts BOP00232). Additionally, Mr. Pacheco-Figueroa notes that the contract provides that quality assurance measures would be designed and implemented by the FDC. *See id.* (discussing BOP00227, BOP00238).

      B.      **Mr. Pacheco-Figueroa's Injury and Medical Treatment**

On August 17, 2019, Mr. Pacheco-Figueroa fell and injured his right arm. Compl. ¶ 12. On August 19, 2019, FDC nurse practitioner Christine Nelson examined Mr. Pacheco-Figueroa's arm and noted "upper arm and elbow swelling, throbbing pain and a triceps tremor." *Id*. at ¶ 13. On August 22, 2019, an x-ray indicated that Mr. Pacheco-Figueroa had a triceps tendon injury. *Id*. ¶ 14.

On August 23, 2019, FDC physician Dr. Raeph Laughingwell reviewed the x-ray and ordered an MRI for further evaluation, and directed that the MRI be completed by August 30, 2019. Compl. ¶ 18. According to medical records, the request was marked as a "routine" priority. *See* Resp. 6 (citing Medical Records BOP00126). The URC—which the Government concedes is chaired by a BOP employee—did not approve that request until September 10, 2019, and on September 11, 2019, the consultation request was sent to NaphCare. *See id.* at ¶¶ 20-21. Ms.

4

Stegeman avers that "the FDC requested that the MRI be scheduled for the first available appointment," but does not cite to any specific document to support that statement. *See id.* at ¶ 22.

Mr. Pacheco-Figueroa did not receive an MRI until November 6, 2019. Compl. ¶ 21; Stegeman Decl. ¶ 23. However, the FDC physician did not receive that MRI report from NaphCare until November 13, 2019. Stegeman Decl. ¶ 24 (citing Medical Records BOP00125). The MRI reportedly revealed a "[n]ear full-thickness tear of [Mr. Pacheco-Figueroa's] triceps tendon" and a "[c]hronic complete tear of [his] radial collateral ligament." *See* Medical Records BOP00125; Compl. ¶ 24.[2] After reviewing the MRI results, Dr. Laughingwell ordered a consultation with an orthopedic surgeon and specified that the consultation was to occur by November 20, 2019, but again marked the request as a "routine" priority. *See* Compl. ¶ 26; Resp. 6 (citing Medical Records BOP00125). Ms. Stegeman avers that on November 18, 2019, the URC reviewed that request and approved a consultation with an orthopedic surgeon "for priority scheduling," but again, no specific document is cited to support that statement. *See* Stegeman Decl. ¶ 26.

NaphCare scheduled a consultation with an outside orthopedic surgeon for December 5, 2019, and Mr. Pacheco-Figueroa attended the consultation on that date and received another MRI. *See* Compl. ¶ 28; Stegeman Decl. ¶¶ 27-28. Mr. Pacheco-Figueroa alleges that the consulting physician from Rothman Orthopedics diagnosed Mr. Pacheco-Figueroa with a "traumatic rupture of his right collateral ligament" and recommended surgery, but noted that it

---

[2] Mr. Pacheco-Figueroa alleges that, according to reasonable medical standards, failure to surgically repair a triceps tendon rupture within four weeks of an injury can result in "significant disability, weakness, pain, and deformity." Compl. ¶¶ 16-17. And a torn radial collateral ligament can "lead to pain, instability, and a disruption of the arm's normal functioning." *Id.* at. ¶ 25.

5

was "very unlikely that the lateral collateral ligament would be able to be repaired." Compl. ¶¶ 30-31; *see also* Medical Records BOP00185. The orthopedic surgeon also allegedly informed Mr. Pacheco-Figueroa that his injury had started to heal improperly, so he needed surgery as soon as possible. Compl. ¶ 32.

On December 9, 2019, Dr. Laughingwell received and reviewed the MRI, and, on that same date, Dr. Laughingwell directed that Mr. Pacheco-Figueroa receive surgery by December 16, 2019, but he again marked the priority of the request as "routine." *See* Compl. ¶ 33; Stegeman Decl. ¶ 29; Resp. 6 (citing Medical Records BOP00123). Ms. Stegeman alleges that the URC approved that request on December 9, 2019. Stegeman Decl. ¶ 30.[3] However, Ms. Stegeman also states that the consultation request for surgery was not submitted to NaphCare for scheduling until December 13, 2019. *See id.* at ¶ 31.

Mr. Pacheco-Figueroa had surgery on February 3, 2020. Compl. ¶ 36; Stegeman Decl. ¶ 32. Ms. Stegeman avers that no complications were noted after the surgery. Stegeman Decl. ¶ 32 (citing Medical Records BOP00165-67). Mr. Pacheco-Figueroa alleges that his surgeon remarked that "the surgical repair had been abnormally extensive because the triceps muscle had retracted significantly due to the delay in care, and that he had never before needed to use so much muscle from a cadaver to reconstruct a triceps." Compl. ¶ 38.

Mr. Pacheco-Figueroa also alleges that he did not receive adequate post-operative pain management, and that he did not receive physical therapy until he requested it, and then was only taken to two sessions several months after his surgery. *See id.* at ¶¶ 39-40. In the months leading up to his surgery, Mr. Pacheco-Figueroa allegedly experienced anxiety and sleeping difficulties

---

[3]   Ms. Stegeman's declaration cites Medical Records BOP00123 to support this allegation, but the court reviewed that record and found no reference to the URC or any "approval" of Dr. Laughingwell's request.

due to his pain and his fear that he would sustain long-term damage from the treatment delay. *See id.* at ¶¶ 43-45. At the time that his complaint was filed, Mr. Pacheco-Figueroa continued to experience chronic pain and weakness in his right arm and could not perform physically challenging jobs within the prison. *See id.* at ¶¶ 41-42.

Ms. Stegeman's declaration also details Mr. Pacheco-Figueroa's post-operative care. *See* Stegeman Decl. ¶¶ 33-59. Two particular details are relevant to the court's reasoning: First, the aftercare consisted of a combination of visits with FDC's medical staff, at two follow-up appointments with the outside orthopedic surgeon (on February 20, 2020, and March 22, 2021), and two physical therapy sessions (on April 26, 2021, and June 8, 2021). *See id.*[4] Second, on March 13, 2020, the BOP initiated a COVID Action Plan that placed additional restrictions on outside medical appointments, resulting in the cancellation of any non-emergency medical appointments, which were then reviewed and reprioritized on a case-by-case basis. *See id.* at ¶ 60. This allegedly impacted some of Mr. Pacheco-Figueroa's follow-up appointments. *See id.*

C. **Procedural History**

Mr. Pacheco-Figueroa filed a timely Administrative Tort Claim to the BOP on July 21, 2021. Compl. ¶ 7. The BOP did not respond to the claim, so it was constructively denied on January 21, 2022. *See id.* He then filed a complaint in the instant action on October 13, 2022. *See id.* The Government filed its Motion to Dismiss on February 17, 2023. *See* Mot. to Dismiss. This matter was reassigned from the Honorable Gerald J. Pappert to this court on February 22, 2023. *See* Order, ECF No. 17. Mr. Pacheco-Figueroa filed his Response to that motion on March 17, 2023. *See* Response. On April 14, 2023, the Government replied to that Response. *See* Reply in

---

[4] Mr. Pacheco-Figueroa notes that, on February 20, 2020, his orthopedic surgeon recommended a follow-up appointment in four weeks, but the FDC did not submit a consultation request to NaphCare until March 11, 2020. *See* Resp. 7 (citing Stegeman Decl. ¶ 45).

Supp. Of Mot. to Dismiss, ECF No. 24 (hereinafter Reply). The parties attended an Initial Pretrial Conference on September 12, 2023, and the court informed the parties of its decision to deny the Government's motion to dismiss, with an opinion and order to follow.

## II.     STANDARD OF REVIEW

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). This case involves a factual attack, which allows a defendant to "attack[] the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.' " *See id.* (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). When this factual challenge is made, the plaintiff has the burden to prove that jurisdiction exists; and the court may consider evidence beyond the pleadings to "satisfy itself as to the existence of its power to hear the case." *See id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

In the instant motion, the government asserts two exceptions to the FTCA and claims that the court does not have jurisdiction over the case if either of the two exceptions applies. The Third Circuit has permitted district courts to consider such FTCA jurisdictional issues in Rule 12(b)(1) motions, but it has cautioned that, "where jurisdiction is intertwined with the merits of an FTCA claim, [the] district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion." *See CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008). Specifically, "when faced with a jurisdictional issue that is intertwined with the merits of a claim, district courts must demand 'less in the way of jurisdictional proof than would be appropriate at a trial stage.'" *See id.* (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)). This less demanding standard of proof ensures that courts do not

prematurely dismiss cases in which jurisdiction could be established if the plaintiffs are afforded discovery. *See id.* at 145.

## III. DISCUSSION

According to the doctrine of sovereign immunity, the United States cannot be sued without its consent. *See CNA*, 535 F.3d at 140 (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). The Federal Tort Claims Act (FTCA) constitutes a limited waiver of sovereign immunity that allows the United States to be sued in federal court based on the tort law of the state in which the alleged tort occurs. *See* 28 U.S.C. § 1346(b)(1).[5] However, there are several exceptions to that limited waiver of sovereign immunity. Here, the Government asserts that two exceptions to the FTCA apply—the independent contractor exception and the discretionary function exception—and bar Mr. Pacheco-Figueroa's claims. Additionally, the Government briefly asserts that the Prison Litigation Reform Act (PLRA) prevents Mr. Pacheco-Figueroa from recovering solely for emotional distress. For the reasons below, none of these arguments prevent the court from exercising jurisdiction over Mr. Pacheco-Figueroa's claims.

### A. The Independent Contractor Exception Does Not Completely Bar Plaintiff's Claims

The FTCA specifically pertains to injuries caused by federal employees and disclaims liability for the acts of "any contractor with the United States." 28 U.S.C. § 2671. This is often referred to as the independent contractor exception to the FTCA. *See Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997). The key question that distinguishes a federal agency from an

---

[5] Specifically, the FTCA provides that federal district courts have exclusive jurisdiction over "claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

independent contractor is whether the federal government supervises the actor's day-to-day operations. *See United States v. Orleans*, 425 U.S. 807 (1976).

The Government correctly notes that district courts in the Eastern District of Pennsylvania have dismissed FTCA claims under Rule 12(b)(1) where it was clear from a contract between the federal government and an independent contractor that the responsibility for a plaintiff's alleged injuries solely lies with the independent contractor. *See* Mot. to Dismiss 13; *Woods v. Sec. of Hous. & Urban Dev.*, 2017 WL 4621690 *3 n.2, *5 (E.D. Pa. Oct. 16, 2017) (collecting cases and dismissing personal injury complaint against federal agency that had contracted full responsibility of maintaining property to independent contractor). But here, it is not facially obvious from the FDC's contract with NaphCare that NaphCare bears sole responsibility for alleged delays in the FDC's timing or prioritization of consultation requests that the FDC chooses to submit to NaphCare. To the contrary, the contract unequivocally states that "[a]ll FDC referrals shall be the sole responsibility and decision of the Government." *See* Contract Excerpts BOP00232. At most, the contract may be persuasive evidence that *after* (1) the FDC's medical personnel submits a consultation request to the (FDC-led) URC, (2) the URC approves the consultation request, and (3) the FDC electronically transmits the approved consultation request to NaphCare, *then* the responsibility for scheduling the consultation and administering the requested outside services falls on NaphCare.[6]

---

[6] Furthermore, the contract states that NaphCare is "solely liable for and expressly agrees to indemnify the Government with respect to any liability producing acts or omissions by it or its employees or agents," and, in context, "it or its employees" refers to NaphCare or NaphCare's employees. *See* Contract Excerpts BOP00240. It does not follow from that language that NaphCare is liable for the delays in care that are attributable to the FDC's own medical employees or internal consultation request procedures.

None of the cited case law persuades the court that it should declare, as a threshold jurisdictional matter, that Mr. Pacheco-Figueroa cannot possibly prove his claims that BOP medical personnel delayed his necessary surgery and provided deficient post-surgery care. Although the Government cites three cases from other jurisdictions that initially seem analogous to this matter, Mr. Pacheco-Figueroa persuasively distinguishes all three cases. *See* Mot. to Dismiss 14; Response 13 (both discussing *Brown v. United States*, 2017 WL 4155218 (S.D. Ind. Sept. 19, 2017), *Grace v. United States*, 754 F. Supp. 2d 585 (W.D.N.Y. 2010), and *Krembel v. United States*, 2019 WL 1429585 (E.D.N.C. Mar. 29, 2019)). Most notably, all three of these decisions were made at the summary judgment phase of proceedings, after the close of discovery.[7] This advanced stage of litigation enabled all three courts to review full records and determine that plaintiffs did not meet their burdens of proving that negligence was specifically attributable to government employees rather than independent contractors who provided specialized medical care.[8] Conversely, Mr. Pacheco-Figueroa cites several cases that, while not

---

[7] *Brown* decided a motion for summary judgment rather than a Rule 12(b)(1) motion. *See Brown*, 2017 WL 4155218 at *1. *Grace* ruled on both the government's Rule 12(b)(1) motion *and* the independent contractors' joint motion for summary judgment. *See Grace*, 754 F. Supp. 2d at 588, 592-95. *Krembel* decided a Rule 12(b)(1) motion at summary judgment *after* denying a threshold motion raising the same claims. *See Krembel v. United States*, 2017 WL 1058179, at *2 (E.D.N.C. Mar. 20, 2017) (rejecting United States' claim that independent contractor exception applies to bar FTCA suit because plaintiff plausibly alleged that *BOP employees* failed to ensure that independent contractor timely provided medical care).

[8] *Grace* actually *undermines* the government's position, because even after fully reviewing the record, the court determined that the motion to dismiss was granted *only* insofar as the plaintiff's claims were based on the alleged negligence of specific medical staff that the court determined to be independent contractors (a physician and university ophthalmology department). *See Grace*, 754 F. Supp. 2d at 599. The *Grace* court found that the plaintiff was not estopped from pursuing administratively exhausted claims against actual employees of the Veteran's Administration, and the plaintiff's claim that Veteran's Administration employees were negligent in rescheduling a follow-up appointment with the independent contractor survived the government's Rule 12(b)(1) motion. *See id.* at 599-601.
*See also Brown*, 2017 WL 4155218 at *13 (finding that "no medical expert opined that there was a delay [in scheduling consultations with outside medical specialists] that fell outside the applicable standard of care"); *Krembel v. United States*, 2019 WL 1429585 at *5 (E.D.N.C. Mar. 29, 2019) ("[T]he

binding upon this court, persuade the court that it would be imprudent to dismiss an FTCA claim that raises plausible allegations of negligent actions of *both* BOP employees *and* independent contractors without at least permitting discovery. *See* Resp. 10-11.

At this early stage, Mr. Pacheco-Figueroa has proffered enough evidence to persuade the court that delays in his medical care may be attributable to *both* federal employees and NaphCare, and that he is at least entitled to discovery to further develop those claims. First, from the date of Mr. Pacheco-Figueroa's first post-injury examination on August 19, 2019, until his surgery on February 3, 2020, there are at least 28 cumulative days in which consultation requests for Mr. Pacheco-Figueroa's first MRI, surgical consultation, and surgery bounced around between BOP employees before ever making it to NaphCare.[9] And the court is not persuaded at this point that the FDC's medical personnel can simply contract away their own responsibilities to triage and offer adequate medical care when it seems that at least two layers of FDC medical personnel are deciding which requests are sent to NaphCare and perhaps how quickly requests are reviewed and transmitted to NaphCare.

---

record clearly indicates the BOP promptly notified [the independent contractor] of plaintiff's approved consultations, and that [the independent contractor] was the sole cause for any delay in treatment.").

[9]    Dr. Laughingwell determined that Mr. Pacheco-Figueroa needed an MRI on August 23, 2019, but that request was not approved and relayed to NaphCare until September 11, 2019—that's 19 days later. Dr. Laughingwell reviewed the MRI and submitted a request for a consultation with an orthopedic surgeon on November 13, 2019, but the URC did not approve that request until November 18, 2019—that's 5 more days. Dr. Laughingwell promptly ordered surgery after reviewing Mr. Pacheco-Figueroa's second MRI, and the URC reportedly approved the surgery on the same day, December 9, 2019, but for some reason, the approved surgery request was not submitted to NaphCare until December 13, 2019—that's 4 more days. Thus, there are at least 28 days where consultation requests were bouncing around between BOP employees before making their way to NaphCare. That number matters here because Mr. Pacheco-Figueroa has alleged (and the Government has not yet refuted) that the recommended window for surgery for his type of injury is four weeks. It is plausible, at this very early stage, that reasonable medical professionals would say that that 28-day delay breached generally accepted standards of medical care.

Second, there appear to be several records in which Dr. Laughingwell, an FDC physician, marked consultation requests as "routine" priority. The Government argues that an FDC physician's classification of requests as "routine" is "irrelevant" because "NaphCare was responsible for exercising independent medical judgment over [Mr. Pacheco-Figueroa's] relevant care," and because NaphCare "had sufficient time to treat [him] on an emergent basis," if NaphCare wanted to do so. *See* Reply 6 n.3. It is not yet clear to the court, from the record that the Government has created, that an FDC physician's prioritization of a request would have no impact on the URC's review of that request or NaphCare's prioritization of the request.

Third, Mr. Pacheco-Figueroa asserts that there were issues with his aftercare and access to physical therapy. By the Government's own factual assertions, it seems that FDC personnel were more directly involved in that allegedly deficient aftercare. However, it is not yet clear how much the BOP's COVID-19 policies limited the FDC staff's treatment options.[10]

Mr. Pacheco-Figueroa correctly notes that a district court may allow limited discovery to ascertain whether it has jurisdiction under Rule 12(b)(1). *See* Resp. 8. However, in this particular case, the court cannot ascertain where jurisdictional discovery would end and merits discovery would begin. This case likely will come down to factual issues such as (1) the extent to which specific delays in treatment were attributable to the FDC's medical personnel rather than NaphCare; (2) whether any delays attributable to the FDC's medical personnel breached standards of medical care; (3) whether any delays in treatment attributable to the FDC in fact exacerbated Mr. Pacheco-Figueroa's injuries; and (4) whether the post-surgical care that was within the FDC's control breached standards of medical care. Even if the court were to authorize

---

[10] As further explained in Part III.B, *infra*, there may be some extent to which the BOP or FDC has discretionary authority to develop COVID-19 policies that may negatively impact incarcerated people who have medical needs unrelated to COVID-19. The court notes, however, that the COVID Action Plan was initiated more than a month after Mr. Pacheco-Figueroa's surgery.

limited discovery about the contract or relationship between the FDC and NaphCare, that discovery could not possibly resolve some of the more complex issues about acceptable standards of medical care, which appear to be unresolvable without medical experts. Thus, there may as well be full discovery.

It is possible that further discovery will reveal that NaphCare is at fault for at least some of the scheduling delays, or that the FDC employees' referral timing, prioritization, and post-surgical care did not breach standards of medical care. If it turns out after discovery that the court does not have jurisdiction over the FTCA claims, then the Government may renew these claims by the deadline for submitting dispositive motions.[11] However, at this early stage of litigation, it does not seem practicable for the court to craft boundaries for limited jurisdictional discovery.

### B. The Discretionary Function Exception Does Not Bar Plaintiff's Claims

The FTCA provides that the Government's sovereign immunity is not waived for claims that are based on a government employee's performance of or failure to perform a discretionary function or duty, even if the employee has abused the Government's discretion. 28 U.S.C. § 2680(a). This is known as the discretionary function exception. The discretionary function exception does not necessarily apply whenever an official can choose from different courses of action. *See S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012). Instead, the purpose of the discretionary function exception is to prevent litigants from "second-guessing 'legislative and administrative decision grounded in social, economic, and political policy.'" *Id.* (quoting *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)).

---

[11] "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Initially, a district court "must identify the conduct at issue." *Merando v. United States*, 517 F.3d 160, 165 (3d Cir. 2008). After making that threshold determination, the court applies a two part-test. *See id.* at 164. "First, a court must determine whether the act giving rise to the alleged injury and thus the suit involves an 'element of judgment or choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)).[12] "Second, even if the challenged conduct involves an element of judgment, the court must determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 165 (quoting *Gaubert*, 499 U.S. at 322-23)). The focus of this second prong is on "the nature of the actions taken and on whether they are susceptible to policy analysis" – this prong does not focus on "the agent's subjective intent in exercising the discretion." *See id.* (internal citations and quotations omitted).

> 1. The Government Misconstrues the Conduct at Issue

Here, the Government extensively argues that the plaintiff's claims are barred by the discretionary function exception. But the Government misidentifies the conduct at issue: Mr. Pacheco-Figueroa has not challenged the BOP's discretionary authority to outsource prisoners' medical care to NaphCare. *Cf.* Mot. to Dismiss 18-22 (arguing that "[d]ecisions to delegate certain medical care services and functions to an independent contractor are protected by the discretionary function exception"); Resp. 16 ("Mr. Pacheco-Figueroa does not contest that the United States retains discretion as to how to discharge its duties to provide medical care for incarcerated people in BOP facilities and whether to enter into contracts to do so."). Nor has Mr. Pacheco-Figueroa accused the BOP of failing to properly train or supervise NaphCare. *See* Mot. to Dismiss 22. Instead, Mr. Pacheco-Figueroa asserts that the FDC's employees "negligently

---

[12] "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Merando*, 517 F.3d at 164 (internal citations and quotations omitted).

provided care in their own right and failed to follow the compliance assurance safeguards that *are* included in the contract with NaphCare." *See* Resp. 17. Thus, phrased a bit more neutrally, the conduct at issue is (1) FDC employees' abilities to delay or prioritize the referral of a federal prisoner's medical care to the independent contractor that will schedule necessary surgery, and (2) FDC employees' abilities to provide post-surgical care independently from independent contractors.[13]

### 2. Medical Decisions Generally Involve Judgment or Choice

A BOP employee's timing and prioritization of a referral to an independent contractor that will perform advanced medical care involves some degree of judgment or choice. Congress has determined that the "Bureau of Prisons . . . shall . . . provide for the safekeeping, care and subsistence [and] protection . . . of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3). Both parties rely on this statute to make very different arguments: The Government argues that 18 U.S.C. § 4042(a) gives the BOP discretion over how it provides medical care to federal prisoners, while Mr. Pacheco-Figueroa cites 18 U.S.C. § 4042(a) as support for his contention that the Government "does not have the discretion to *fail to provide* medical care or to provide *inadequate* medical care." *See* Mot. to Dismiss 17; Resp. 16. But the terms "safekeeping, care and subsistence [and] protection" could have a wide range of possible interpretations by prison officials, and policies implementing this mandate can look very different. It appears that the BOP's medical personnel must provide adequate medical care to incarcerated people, but they have some degree of choice in how they will provide that care.

---

[13] The court notes that the contract specifically states that "[t]he BOP . . . is under no obligation to follow consultant recommendations." *See* Contract Excerpts BOP00232. This presumably gives FDC employees autonomy in providing post-surgical care.

### 3. The Discretionary Function Exception Was Not Designed to Shield Delays or Triage Decisions in Medical Care Referrals

Although there is some element of judgment involved in a BOP employee's prioritization and timing of medical referrals to NaphCare, these case-by-case medical determinations are not the type of judgments that the discretionary function exception was designed to shield.

The Government's focus on *Rodriguez v. United States*, 2016 WL 4480761 (M.D. Pa. Aug. 23, 2016), is misplaced. In *Rodriguez*, the plaintiff specifically challenged the BOP's "contract policy for outsourcing health care issues that cannot be treated at the respective facility" as "defective," arguing that it made it impossible for BOP to adequately screen, train, and supervise the contracted health care personnel. *See Rodriguez*, 2016 WL 4480761 at *8. Importantly, Mr. Pacheco-Figueroa does not challenge the BOP's high-level policy determination to outsource medical care to NaphCare. Nor does he challenge the BOP's lack of oversight over NaphCare after a referral is made.

Generally, the BOP does and should have broad policymaking authority to enter contracts to engage independent contractors to provide medical care that the BOP cannot adequately provide in its own facilities. But *Rodriguez* is not persuasive insofar as it broadly declares that "implementation of health and medical care duties is left to the discretion or judgment of the BOP," before delving into its more specific and careful holding that the BOP's contract policy for outsourcing health care issues is discretionary. *See id.* The Third Circuit has not declared that all health and medical care is a discretionary function of the BOP. And while no federal law or regulation requires or curbs the BOP's ability to outsource medical care, no federal law permits the BOP to exercise its discretion to provide substandard or negligent medical care.

More specifically, the initial triage of emergent medical issues and the timing and prioritization of referrals to outside specialists are not legislative or administrative decisions that

17

can be easily grounded in social, economic, and political policy. These are nuanced medical decision to be made on a case-by-case basis by practitioners with adequate medical knowledge. These are decisions that are cognizable in regular tort and medical malpractice law.[14] Either an injury is referred in time for an independent contractor to adequately treat the injury or it is not. A medical practitioner who has no expertise in prison administration could make most medical decisions that BOP medical personnel make,[15] but a prison administrator who has no medical expertise would not have adequate knowledge to make most of the medical triage and referral decisions that medical professionals regularly make.

Moreover, the BOP's high-level decision to outsource advanced medical care to independent contractors is perhaps itself an acknowledgement that BOP employees have no special ability to provide certain types of medical care. It is perhaps contradictory for the BOP to make a very practical decision to outsource surgeries like the surgery that Mr. Pacheco-Figueroa

---

[14] For this reason, the Government's invocation of *Brown v. United States*, 2018 WL 741731 (E.D. Pa. Feb. 7, 2018), is unpersuasive. The Government relies on *Brown* to argue that Mr. Pacheco-Figueroa cannot support a negligence claim "by second guessing the conduct of the United States in contracting with NaphCare and supervising NaphCare's performance of its duties under the Contract." *See* Mot. to Dismiss 19-20. *Brown* specifically states that claims involving "allegations of negligent hiring, supervision, and retention against the [Veteran's Administration] . . .. fall within . . . the discretionary function exception . . . *absent a policy that expressly mandates specific supervisory, retention, or hiring practices*." *See Brown*, 2018 WL 741731 at *5 (emphasis added). Here, Mr. Pacheco-Figueroa does more than merely challenge the BOP's supervision of independent contractors; he makes medical malpractice claims about medical practitioners who happen to be BOP employees, and he alleges that BOP personnel's delays in submitting referrals to NaphCare exacerbated his injuries.

[15] A facility-wide policy like the COVID Action Plan likely presents an exception to this generalization. Experts in medical care and/or public health crises in institutional settings would likely have more expertise than the average medical practitioner in designing policies that will adequately prevent the spread of COVID-19 in those facilities. Perhaps a prison-wide COVID-19 triage policy would fall within the BOP's discretionary authority, and that sort of policy might result in the deprioritization of a non-contagious medical issue like Mr. Pacheco-Figueroa's injury. However, the existence of the COVID Action Plan cannot completely extinguish Mr. Pacheco-Figueroa's claims. All of the allegedly negligent events leading up to Mr. Pacheco-Figueroa's surgery predate the COVID Action Plan, and the COVID Action Plan cannot completely negate the BOP's duty to provide adequate medical care to all incarcerated people in its care.

needed, while also arguing that it retains discretionary authority over how it may delay that surgery through its own administrative processes. So, although BOP personnel who treated Mr. Pacheco-Figueroa had multiple options as to how they would prioritize his treatment and how quickly they would refer him to NaphCare, there is no reason that the BOP is sheltered from liability for decisions that allegedly constituted negligent medical treatment.

For all of these reasons, the choices of individual BOP employees to delay or defer medical referrals or deprioritize or prioritize Mr. Pacheco-Figueroa's medical care are not immunized by the discretionary function exception. Mr. Pachecho-Figueroa is entitled to conduct further discovery to determine whether these decisions amounted to negligence in providing necessary medical treatment.

**C.     It Is Premature to Dismiss Plaintiff's Request for Compensatory Damages for Emotional Distress**

Finally, the parties agree that the Prison Litigation Reform Act prevents a plaintiff from solely recovering for mental or emotional injury. *See* Mot. to Dismiss 23; Resp. 17.  The Government argues that, since Mr. Pacheco-Figueroa does not plead any physical injury that was directly caused by BOP employees, his compensatory damages claim for emotional distress cannot survive. Mot. to Dismiss 24. If, after further discovery, Mr. Pacheco-Figueroa ultimately cannot demonstrate that the BOP was negligent in its provision of necessary medical treatment, then he would not be able to recover for emotional distress from the BOP. But if it turns out that the BOP was negligent in its efforts to refer Mr. Pacheco-Figueroa for medical treatment, and those negligent delays in care exacerbated his physical injuries, then he may potentially recover compensatory damages for emotional distress. Thus, it would be premature at this stage for the court to declare that Mr. Pacheco-Figueroa cannot recover compensatory damages for emotional distress.

## IV. CONCLUSION

For the foregoing reasons, the Government's motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) is denied without prejudice. Mr. Pacheco-Figueroa is entitled to discovery for his claims, and the Government may renew this motion at the close of discovery.[16]

**BY THE COURT:**

_____
**HON. KAI N. SCOTT**
**United States District Court Judge**

---

[16] The court is willing to reconsider the independent contractor exception with the benefit of a fuller evidentiary record. However, the court is not likely to revisit its position on the discretionary function exception, absent arguments or facts that were not presented in the instant motion.